May it please the Court. Good morning, Your Honors. My name is Amy Grogan, and I represent Meade Electric. There are three issues that are up on appeal before you. The first is whether the trial court erroneously held that Meade's AccuBid system and its resulting bids were not trade secrets under the Illinois Trade Secret Act. The second is whether the trial court erroneously held that the defendant's conduct did not rise to misappropriation under the Trade Secret Act. And the third is whether the trial court erroneously allowed, over plaintiff's counsel objection, defense counsel to present exhibits in cross-examination that were not going to be offered into evidence. The first issue, we'll take them in turn, is the trial court stated that the AccuBid system and its resulting bids were not trade secrets. A trade secret is defined in the Act as sufficiently secret and that the company took affirmative measures to prevent others from acquiring this information. In Stenstrom and several other cases, they set forth the six common law factors, which I'm sure that you are familiar with. If you look at the record, Meade's bid process, they did have a protectable interest. The AccuBid system was not known at large. In fact, Meade protected it such that they used a key system where each employee who had access to it, they had to have a $3,000 USB drive in order to get into it. Yeah, but there were 50 people who had access to it, including the secretary. Except that there's 1,500 people in the company and you have all these bids all over and you're still protecting it. And you put it, and they also put it in their handbook that this is protectable information, that this bid process. If we took the actual bid system itself and said that any bid systems are all fine and everybody can compete that way, then we would all have to just, we might as well have bids that are open. Even their clients had access to it. Was it 10% of the Lake County? That was the time and material. But that goes into making the bids. It goes into, but you can't reverse it out. If you look at the testimony at trial, Dave Leally did testify that, in fact, you can't get that back to their materials and all that. He said they could reverse it out in order to determine what Meade's profits would be and one other factor. If you look at it closely, and we do set it forth actually in our reply brief, that in fact he didn't testify to that. He testified that you can certainly back out the labor rates and things like that, but in fact Meade gets something different on materials and things like that because of the people that they work with that are plugged in there. They get different rates on things. They don't get the same rate as the guy down the street. So you would never be able to figure out what the profit was. It's not just the profit. I get that Stenstrom says, you know, if all we're talking about is profit, and so do a lot of the other cases. And if you look, there's been a case in the Northern District since Stenstrom that actually took the opposite opinion, and it's SKF USA, Inc. versus Bejerkness, and it's 2010 West Law 3155981. And in that case, they had a database system, and the defendants argued that the proprietary database pattern was nothing more than general industry practice. The court held that, although similar patterns were used in the industry, just the same as here, the pattern at issue here was unique. And that's what we have here. This is a unique system. In addition, the bids itself certainly are unique. You get a bid, this actual gentleman, the defendant, actually wrote out the bid, and he submitted these bids on the same projects. And if you see other districts have held, and we quoted the case, that in fact the bids resulting there are protectable. And how can you say this is a unique system when any company could go and buy the program that AccuBid program and utilize it in their own corporate business? And I think that in this computer industry, we all get templates that we do access. You know, I get my time matters, and so does every attorney in town. It's the stuff that I put in that's important. And Mr. Liali testified at trial, it's the stuff that they actually plug into those. It's those units of measure. It's those materials. It's that kind of system itself. And certainly the bids that are shot out at the end that are actually generated in this gentleman's hands are certainly protectable. And they are trade secrets. And so it becomes that it's not the database you can buy anywhere, but it's the actual stuff that gets put into the program. And the actual stuff that gets shot out at the end when you actually have a bid on a certain project. So then if we look at the actual bids being confidential, you can see that in fact Meade's bids and Krause's bids were very similar, if not identical. And that leads me to the misappropriation. You can misappropriate under the Trade Secret Act in three ways. Improper acquisition means that, in fact, three days before Mr. Wicks left, that he tried to email the files home to his home computer. He couldn't do it. Then suddenly that afternoon, somebody came into his exact computer and zipped everything down into a zip drive. And he took that information. Misappropriation can just be, according to the Liebert case, just the improper acquisition. Even if he doesn't use it, you still have it. You still have misappropriation. As long as you can show damages. And at this point we have these three exact bids. One thing I could never figure out from your briefs, did Mr. Wicks download the AcuBid system? Was that part of what he downloaded in his program? It's from the AcuBid system. It's the information in it, the actual bids. But the actual system itself, that actual program, he didn't download it? He did not. He did not. I don't think that it's actually possible to do it that way. It's a protectable, it's more of a computer framework, for lack of a better word. So we believe that we did show that the misappropriation occurred. And even if you didn't believe that he did take it in this manner, he certainly used the information. He bid on the same three jobs. He was the guy that bid at Mead. He's the guy that bids at Krause on these three projects. The actual bids themselves, if the court is to find that they are trade secrets, he certainly, we believe, that we showed that there was unauthorized acquisition. But certainly there was unauthorized use. Which leads to the last issue, which is at trial there was a pre-trial order in which the exhibits were to be submitted before, and then we each had 14 days to go and exchange objections. Defense didn't provide any exhibits. At cross-examination, he used exhibits. First time the court did allow because of the scope and stated that he couldn't use them. When Mr. Molman took the stand, he did in fact, was allowed to use documents. And these documents weren't signed by Mr. Molman for impeachment purposes or to refresh his reflection. They were to discuss his hand notations on them. And it's our contention that that's improper use because these were not going to be in evidence. And the damages that were allowed were the, that in fact they were trying to show that he didn't misappropriate these because they're not trade secrets because your bids changed. And so we believe that that did weigh in on the judge. Thank you. Thank you, counsel. Do you have a question? Oh, do you have a question? Please, the court. As you obviously very well know, this is a 5-2-11-10 directed finding in a bench case. Can you identify yourself for the record, please? I'm sorry, your honor. Richard Mortel on behalf of defendant Abilie John Wicks. Please proceed. I think the court's ruling was very well reasoned. We've cited the Kokinas case, Heller, and there's just a dearth of cases in this situation with the 5-2-11-10 in a bench case for a directed finding at the end of the plaintiff's case that the trial court's findings have to be given great deference. I think what, and I believe what the appellant has done here, is regurgitated trial evidence, great deals of trial evidence, and set it before this court saying you should come to a different conclusion. That's not the way the law works, your honor. This is a, if the trial court's finding was against the manifest weight of evidence, perhaps the court would be, you know, coming up with a new conclusion and reweighing the evidence. But that's not the case. John Wicks was an employee only. He was not, and I know that the, it's not directly under appeal now the issue on the breach of fiduciary duty, but John Wicks, but it is, I think it's relevant because it gives perspective to the larger case here. John Wicks was just an employee, not a director, not an owner, so he didn't have a higher duty of care. When John left Meade, he in fact did re-bid three jobs that are at the center of Meade's case, but those were re-bids, and that's what counsel didn't mention and what the trial evidence didn't address was that these jobs were at three of the same customers, but John is, he left Meade. He can go seek business from those customers, which he did. One of the jobs was a job that was given to him without a bid. Two of the other jobs were actually re-bids of jobs that John did before he left Meade. So they're a re-bid. It's a new scope on the job. One of the, in fact, this is some of the evidence that came out on cross at trial. One of the jobs Meade actually And so did Meade. I thought that the evidence wasn't clear whether or not Meade bid on that third job or re-bid on the third job. They claimed they re-bid on the third job, but they didn't come in with the number, what the number was on the third job. The one job that they did come in with a number was actually less than John Wick's number. So, you know, and I think, you know, and I'm sure the court figured this out in reading the briefs and the record and so forth. Meade's case was vague. I mean, it's nebulous. You know, from best I could tell is that somehow John Wick's should never re-bid any work after he leaves Meade that he bid previously. You know, he shouldn't, he should have no connection with these customers on any of these jobs. First of all, the job scopes had changed on two of the jobs. So it's a different bid. So even if John remembered, you know, what he did in the evidence is in the record. Before John left Meade, he tried to download his entire computer. Family pictures, there's everything that was in his computer. And as the trial court said when she ruled that if this was something that was so important to John, it was such secret information that he was trying to steal from Meade, he would have done it, I think she said, surreptitiously. In other words, he would have done this quietly, taken it home over weekends and done it where it couldn't be, you know, it was very There was some evidence, it was his entire computer. Some of it, what was in the zip drive was some of his previous bids, family pictures, contacts. There was evidence, both verbal evidence from witnesses and from some of the different, you know, John had contacts with people at different construction companies that he remained. He had those before he went to Meade because he had practiced in this field as a journeyman electrician for many years before coming to Meade. So, for example, when he left... He was at Meade for how long, Counsel? I believe seven years, Your Honor. So all of his work that he had done with Meade in seven years, he also downloaded? Everything that was on the computer. And it included work, it included bids, e-mails, just his entire computer. And your position is that this was not misappropriation? Yes, ma'am. Because, well... Why not? He knew that information was not his, he was leaving the company. Well, it was mixed in with... Why would John Lee have a right to take Meade's corporate information? Well, he wasn't... Because of his personal zip drive. He wasn't specifically taking Meade's information alone, it was everything that was in there. And he didn't separate it out. If contained within the information that he took is a Meade trade secret, what difference does it make that his pictures were in there, too? Is there some case that suggests that if it's commingled with personal information, it's no longer a trade secret? Well, no, but I'm sure it's an intent issue. Why is it an intent issue? Either it's a trade secret or it's not. Either he took it when he shouldn't or he didn't. Well, that would go to misappropriation, Your Honor, I believe. Well, misappropriation is just copying. That's all he has to do is copy. He doesn't have to use it. So if it's a trade secret, the question becomes, is it a good trade secret? If the answer to that is yes, and he copied it, where are we at now? Well, I think where we are at is the trial court held that it was not that Meade had not met their burden of proving that this was sufficiently secret to be a trade secret. And any other factors from Senstrom were not proved. And I think that's very clear in the record. And I think there's a great deal more in the record that the court didn't even touch on that could have gone to exactly these issues that would have come out in our favor. I mean, I think this is beyond, you know, I just think it's Meade's attempt to impose a non-compete agreement on John Wicks, who is free to work for or with whoever he wants after he leaves Meade. He just can't use Meade's trade secrets when he doesn't. Well, if they are trade secrets. But the problem is, is how do you take someone that's been a journeyman electrician for many years in that area, when he came to Meade and say, well, you know, I mean, and I don't mean this flippantly, but what do we do? Do we give him a lobotomy when he walks out the door of Meade? And anything that, you know, there is in all the case law on these issues, there's the, you know, you can take certain general skills and knowledge that you've learned on your job with you. And I think the trial evidence was very clear on that, too, that John said he, you know, when he went to these new jobs that were in, it might have the same title. You know, this hospital, Victory Vista. It was a different scope of a job. But he said even if he could have remembered what the earlier bid was when he, that he submitted for Meade, he said he wouldn't use it. He would redo it just because there's error constantly. And he wanted to make sure each time out. But I don't believe there's been any evidence submitted by Meade in any way, shape, or form that's other than just conclusory. And, you know, it is a trade secret because we say it is a trade secret. You know, they just didn't prove their case, and I don't believe they should prevail on appeal. Anything else, counsel? No, ma'am. Thank you. Thank you all. Thank you, everybody. It's Meade's contention that he, that John Wicks cannot bid the same job that he bid for Meade. That's correct. You can't do it because the bid is a trade secret. So if you're going to go and take that. If it's a re-bid, what difference does it make? It's not the same bid. I don't think that it was proved that it was a re-bid, but it was, at this point, I believe that it was the same bid, and that's what we did. And that's what we argued, and that's what I feel we proved in the case. This whole re-bid issue wasn't anything that was ever proven because defense never put their case on. And instead, we talked about the fact that these were identical bids and that there wasn't any change in scope. And so it's those bids that we think that need to be protected. But even if it is a re-bid and there's a small, let's just take, for instance, if there's a small change in the whole scope, there's an advantage in having that knowledge that, wow, at Meade, I worked on $96,000. Now they're just taking out the stairway. Well, I know what a stairway costs, so I'm going to scratch that, and I'm going to be, I have that competitive advantage. And that's the advantage that has to be protected. That's why the bids are done the way they are, so that if we all knew what each other's bids were, why don't we just go in and say, I like you best. And so I think that that's something that needs to be considered. So how did Meade go about protecting this advantage as far as Mr. Wicks was concerned? They didn't even tell him not to take information until he was already going out the door. They didn't give him the handbook until he was on his way out the door. Well, certainly they could not take away information that was in his head. Well, first of all, I don't think that the information was necessarily in his head. Well, he testified that it was in his head. But it can still be a trade secret. If you look at Stampede Tool. He testified also that these were rebids. That's evidence. Okay, but Stampede Tool Warehouse Inc. v. May, 272 Illap, 3D, 580 States, even if the trade secret was just in his mind, you still can't use it. So you still can't use that kind of trade secret. But more importantly is he took the trade secret. He didn't have to use it, and he was given the handbook on the way out the door. He was sat down, and he was met with. He signed it that he got it. Dave Leally testified that he pointed out these are all confidential, and he still used it. So does it matter that he didn't give it when he actually generated the bid? You know, I would say that, first of all, everybody was aware that there was a handbook. He was there for seven years. He knew of the handbook. We didn't have the signed part of the handbook until he left. It wasn't in his file. Counselor, you're testifying now. That's not in the record. Okay, so my point is that when he finally did, in fact, use the bids, he was aware that they were confidential. He was aware that they were trade secrets. And so even if they're in his mind and we agree that if we go and we say that he didn't download them and he didn't take them with him and he didn't put them in his computer, still, if it's a trade secret, it's misappropriation to use it. All right. Thank you. Thank you. This matter will be taken under advisement. This Court is adjourned.